UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

ADMIRAL INSURANCE CO.,
                Plaintiff,

v.

G4S YOUTH SERVICES,
                Defendant.

Action No. 3:07–CV–656

MEMORANDUM OPINION

THIS MATTER is before the Court the parties's Cross-Motions for Summary Judgment (Doc. Nos. 27 and 29). For the reasons below, this Court DENIES Plaintiff's Motion and GRANTS Defendant's Cross-Motion for Summary Judgment.

## I. BACKGROUND

On October 23, 2007, Plaintiff, Admiral Insurance Company ("Admiral Insurance" or "Admiral"), brought the entitled matter seeking a determination of their obligation to defend and indemnify G4S Youth Services, LLC ("G4S") in the case of <u>Mary Harris as Personal Representative for the Estate of Shanique Harris, et al. v. G4S Youth Services, LLC</u>, Case No. 2007 CA-329 ("the Underlying Case"), which arises out of the July 14, 2006 shooting death of Shanique Harris. The Underlying Case is currently pending in the Circuit Court of the 19th Judicial Circuit in Okeechobee County, Florida. Though presented in separate Motions, the parties merely argue different sides of the same issue, namely, whether Harris's death on G4S's premises "arises out of and is in the course of" her employment with G4S, thereby excluding the incident from coverage under the parties's insurance policy, and divesting Admiral Insurance of their duty to indemnify and defend G4S in the underlying Florida state case. In its determination,

1

the Court reviewed the applicable insurance policy, facts surrounding Harris's death, and Complaint in the Underlying Case.

### Insurance Policy

G4S, headquartered in Richmond, Virginia, works in conjunction with the Florida Department of Juvenile Justice ("Florida DJJ") to operate several juvenile correctional facilities in Florida, including the Okeechobee Juvenile Offender Corrections Center ("OJOCC") in Okeechobee, Florida.  On April 19, 2005, G4S hired Marsh USA Inc. ("Marsh"), an insurance broker, to help the company obtain a commercial general liability insurance policy covering eight (8) properties, including the OJOCC.  Through Marsh, G4S obtained insurance from Admiral Insurance Company for the August 1, 2005 to October 1, 2006 policy period.  Per the parties's contract, Marsh accepted delivery of the policy in Atlanta, Georgia.  The policy listed Florida DJJ as an additional insured organization, but only as to the DJJ's Florida locations.

As with similar general liability insurance policies, the Admiral Insurance policy covered G4S for "bodily injury and property damage caused by an occurrence under the policy that takes place in the coverage territory", subject to policy exclusions and liability limits.  (Comm. Gen. Liability Policy, Form CG 00 01 12 04 (hereinafter "Policy Coverage Form") ¶ 1(a)–(b).)  In the present matter, the parties disagree as to the meaning and purpose of the "Employer's Liability" exclusion.[1]  This provision excludes:

**Employer's Liability Exclusion**

---

[1] The parties's briefings placed two exclusions in dispute, the "Employer's Liability" and the "Worker's Compensation" exclusions.  However, at the Motion's Hearing, Plaintiff withdrew their contentions surrounding the "Worker's Compensation" exclusion.

>Bodily Injury" to (1) an "employee" of the insured arising out of and in the course of (a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business. . . . This exclusion applies: (1) [w]hether the insured may be liable as an employer or in any other capacity; and (2) [t]o any obligation to share damages with or repay someone else who must pay damages because of the injury. This exclusion does not apply to liability assumed by the insured under an insured contract. (Id. ¶¶ 2(d)-(e).)

Further, the policy requires Admiral Insurance to defend G4S for damages occurred under the policy. Specifically, the policy states Admiral Insurance:

>[W]ill have the right and duty to defend the insured against any "suit" seeking [damages the insured is legally obligated to pay because of "bodily injury"]. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. (Id. ¶ 1(a).)

On July 14, 2006, this policy, with its exclusions and duty to defend, was in effect.

<u>July 14, 2006 Killing of Shanique Harris</u>

Marlon "Pete" Brown and Shanique "Quan" Harris began dating in 2001. As time progressed, the relationship became violent. On January 31, 2006, Harris obtained an Injunction for Protection Against Dating Violence, which, among other things, prohibited Brown from having any contact with Harris. This injunction covered a period of approximately three weeks. At some time prior to July 14, 2006, Harris decided she wanted to end her relationship with Brown. Brown, apparently, did not want the relationship to end. On the evening of July 14, 2006, Brown, attempting to reconcile with Harris, purchased a greeting card and drove to Harris's job. Brown knew Harris was an employee of the OJOCC, and that she was scheduled to work the 10:00 p.m. to 6:00 a.m. shift that evening. When Brown arrived at the OJOCC, he did not see Harris's car. The facility's cameras captured Brown driving around the OJOCC parking

3

lot, and upon seeing his vehicle, G4S employees called the sheriff's department. Shortly after leaving the lot, Brown saw Harris in her car and returned to the parking lot.

After returning to the lot and approaching Harris, Harris and Brown engaged in conversation. Harris was seen slapping an item out of Brown's hand, purportedly the greeting card and an engagement ring Brown had previously purchased. Shortly thereafter, at approximately 10:30 p.m., Brown pulled out a gun and shot Harris in the head, right breast, and left buttock. Harris died of her wounds. At the time of the shooting, Harris was late for work and had not entered the building.[2]

Stemming from the July 14, 2006 shooting, a claim for workers's compensation was filed on Shanique Harris's behalf. A "First Report of Injury or Illness" was filed with the Florida Department of Financial Services's Division of Workers Compensation on or about July 17, 2006. These benefits were denied in a July 21, 2006 letter. According to the letter, workers's compensation benefits were denied because investigation determined "the employee did not sustain an injury by accident which arose out of or in the course and scope of employment. There is no causal connection between the injury and death of the employee and her activities of employment . . . [and further,] [t]he

---

[2] The parties assert additional disputed facts surrounding the death of Harris that they believe impacts the Court's determination of whether the incident "arose out of" Harris's employment. Specifically, Plaintiff contends Harris "was bringing food and drink to the Facility for several individuals, including [her supervisor] Commander Birts" at the time of the incident. (Pl.'s Mot. for Summ. J. 3.) When Harris arrived at the OJOCC building, Brown "intercepted her in the parking lot and refused to allow her inside" the building. (Id.) Finally, Plaintiff states Harris's "supervisor attempted to intervene and ordered [] Harris inside to begin work, but she was prevented from entering the building by [] Brown." (Id.) Defendant also contends a G4S employee saw Brown had a gun and did not take proper precautions. These asserted facts are in dispute.

cause of her injury and death was personal in nature." (Harris's Notice of Denial 2.) Mary Harris, the deceased's mother, then filed a civil complaint in Florida state court.

<u>The Underlying Florida Case</u>

On September 14, 2007, Mary Harris filed a Complaint against G4S in Florida's Circuit Court seeking damages for the alleged wrongful death of Shanique Harris. In response to the Complaint, G4S requested Admiral Insurance defend and indemnify the company against the alleged liability. The original Complaint alleged Shanique Harris was a business invitee of the OJOCC and, as such, was owed a duty by G4S to use reasonable care under the circumstances. (Compl. in Underlying Case ¶ 9–10.) The specific circumstances Plaintiff alleged were G4S's knowledge of Harris's restraining order against Brown, knowledge that Brown had been physically abusive towards Harris and threatened her with a gun, and awareness of the serious physical threat Brown posed to Harris. (<u>Id</u>. ¶ 11.) Plaintiff further alleged G4S ignored these warnings and therefore breached their duty of care in one or more of the following respects:

> (a) failing to properly alert staff to be on the lookout for Marlon and/or his vehicle;
>
> (b) failing to timely notify law enforcement of Brown's presence;
>
> (c) failing to notify Shanique Harris of the presence of Brown at the Facility;
>
> (d) failing to establish and enforce standards of operation at the Facility to prevent the free flow of persons or vehicles through the parking lot;
>
> (e) failing to take proper security measures after Harris placed the Facility on notice of serious and imminent danger;
>
> (f) failing to properly notify personnel assigned to or charged with monitoring surveillance cameras surveying the Facility's parking lot to be on the lookout for Brown; and

>(g) failing to post notice in the area that employees should be on the look out for Brown.

As a result of this alleged negligence, Plaintiff contends Shanique Harris suffered a fatal gunshot wound. (Id.)

Upon Motion, the Florida court granted Defendant's Motion to Dismiss or, in the alternative, Motion for a More Definite Statement. The Court held: (1) "the defendant did not create a zone of risk which foreseeably lead [sic] to the tragic attack on plaintiff's decedent"; (2) the employee-employer relationship which existed between the parties did not create a duty as the "relationship. . . was irrelevant to the homicide . . . the victim was pursued by a dangerous person from her life unconnected to the employment relationship"; (3) the "allegations in the Complaint are too vague to show a foreseeable harm for which the law would impose a burden on plaintiff"; and (4) the "Complaint does not include any allegation to show that the type of negligent acts or omissions of defendant's agents have so frequently previously resulted in the same type of injury . . . that the same type of result may be expected again." (Fl. Ct.'s Order on Mot. to Dismiss 1–2.) Accordingly, Plaintiff was granted leave to amend the Complaint.

Plaintiff's Second Amended Complaint asserts three counts: (1) a negligence claim against Defendant G4S for breaching their duty for the reasons enumerated (a)–(g) above, as well as for (h) failing to follow its own policies and procedures with regard to unknown vehicles observed in the parking lot at the Facility; (2) a vicarious liability claim against DJJ, pursuant to the contract entered into between DJJ and G4S, for the negligence of G4S; and (3) a negligence claim against DJJ, as lessor of the premises upon which Harris was killed, for its acts through its agent, G4S, of breaching

its duty of care to employ sufficient security to protect invitees on the facility's premises.[3] (2d Am. Compl. ) The Second Amended Complaint is similar to the Original Complaint except each claim is enumerated, Plaintiff provides additional factual allegations as to who Harris notified that Brown was a threat, and Plaintiff clarifies the origin of G4S's alleged duty, tracing it to the "special relationship" Harris had with G4S as her employer and as the entity responsible by contract for the security of the premises.

Subsequent to the filing of the Second Amended Complaint, Defendants moved to Dismiss the Amended Complaint; Defendants's Motion was denied without comment. As a result of the standing Second Amended Complaint, Admiral Insurance seeks this Court to determine whether they owe G4S and DJJ a duty to defend and indemnify the companies in the Underlying Case.

## II. LEGAL STANDARD

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In its determination, the Court must review the facts, and the inferences drawn therefrom, in the light most favorable to the non-moving party. Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987). While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[3] On February 27, 2009, DJJ notified G4S that the company owes DJJ the duty to indemnify and defend the Department for any negligence of G4S.

Summary judgment should not be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. However, mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law. Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). Rather, "[w]here no genuine issue of material fact exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

When faced with cross-motions for summary judgment, the Court must review "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Republic Western Ins. Co. v. Williams, 212 Fed. Appx. 235, 237 (4th Cir. 2007). In considering each individual motion, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations marks and citations omitted). The mere fact that both sides moved for summary judgment does not establish that no genuine issue of material fact exists, thus requiring judgment be granted for one side or the other. American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965). Instead, where the basic facts are not in dispute, but the parties "nevertheless disagree as to the inferences to be drawn from them . . . the case is not one to be decided on a motion for summary judgment", and thus both motions must be denied. Id.

Though the summary judgment standard is clear, a procedural structure exists to dictate the manner in which courts analyze motions for summary judgment that are based on a contract's interpretation. The first step is to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. World-Wide Rights Ltd. Partnership v. Combe, Inc., 955 F.2d 242, 245 (4th Cir. 1992). If a court determines the contract is unambiguous, the court may then interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. (Id.)

### III. DISCUSSION

**A. Choice of Law**

In a diversity of citizenship case, a federal court must apply the conflict of law rules of the state in which it is sitting. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Virginia's conflict of law rules states that an insurance policy, like other contracts, must be applied and interpreted in accordance with the law of the state in which it was made. Lexis v. State Farm Mut. Auto. Ins. Co., 251 Va. 390, 394 (1996). A contract is made when the last act to complete it is performed; in the context of an insurance policy, the last act is the delivery of the policy to the insured. Seabulk Offshore v. Am. Home Assur. Co., 377 F.3d 408, 419 (4th Cir. 2004) (citing Buchanan v. Doe, 246 Va. 67, 70–71 (1993) (noting that "generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage.")).

This Court has noted that while it is clear an insurance contract is not made until "delivered" to the insured, what constitutes "delivery" is not as easily discerned. Great Am. Ins. Co. v. Gross, 2008 U.S. Dist. LEXIS 10079 (E.D. Va. Feb. 11, 2008) (J. Spencer). Case law supports either applying the law of the state where the policy is

mailed, or the law of the state where the insured received physical possession of the policy. Id. at *16 (citing Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 419 (4th Cir. 2004) (suggesting the state where the insured took physical possession of the policy is the state of delivery); Condon v. Inter-State Assurance Company, 1988 WL 67599, at *1, 3 (4th Cir. 1988) (holding that a life insurance policy did not become effective until the insurance company delivered the policy by "placing the policy in the mail to the insured")). Using this case law as backdrop, this Court reasoned in Gross that delivery of an insurance policy to a broker, who merely acts as a conduit and is not a necessary party to effectuate the policy, does not constitute "delivery"; rather, delivery does not take place until the insured takes physical possession of the policy. 2008 U.S. Dist. LEXIS 10079, at * 17. In accordance, this Court holds that Admiral Insurance's delivery of the policy to G4S's insurance broker, Marsh, in Atlanta, Georgia, despite Defendant's contentions, does not constitute "delivery" of the policy, as the broker merely served as a conduit for the ultimate delivery of the policy to Richmond, Virginia. Therefore, the applicable law in interpreting the insurance contract is Virginia.

**B. Duty to Defend**

Under Virginia law, an insurer's obligation to defend an action "depends on comparison of the policy language with the underlying complaint to determine whether the claims alleged [in the complaint] are covered by the policy." Superperformance Int'l, Inc. v. Hartford Casualty Ins. Co., 332 F.3d 215, 220 (4th Cir. 2003). In its determination, courts apply the "eight corners rule," reviewing the four corners of the policy to determine the terms of the coverage, and the four corners of the Complaint to determine if the allegations in the underlying action are covered by the policy. Erie Ins.

10

Exch. v. State Farm Mut. Auto Ins. Co., 60 Va. Cir. 418, 423 (Va. Cir. Ct. 2002). While the court looks to the policyholder to show the policy provides coverage, see Furrow v. State Farm Mut. Auto. Ins. Co., 237 Va. 77 (1989), this burden is not particularly demanding since the insurer must defend unless "it clearly appears from the initial pleading the insurer would not be liable under the policy contract for any judgment based upon the allegations." Reisen v. Aetna Life and Casualty Co., 225 Va. 327 (1983); see also Fuisz v. Selective Ins. Co. of America, 61 F.3d 238, 245 (4th Cir. 1995) (noting where both covered and excluded acts are alleged in the complaint, the duty to defend attaches), Donnelly v. Transp. Ins. Co., 589 F.2d 761, 767 (4th Cir. 1978) (noting if a complaint, however ambiguous, may be read as premising liability on alternative grounds, and either ground states liability potentially or arguably covered by the policy, the insured is entitled to a defense). However, when the allegations of the underlying Complaint fail to bring the injuries suffered within the coverage of the policy, there is no duty to defend. Travelers Indemnity Co. v. Obenshain, 245 S.E.2d 247 (1978). Accordingly, in determining whether an insurer has a duty to defend requires examination of: (1) the policy language to ascertain the terms of the coverage, and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy. Fuisz, 61 F.3d at 242.

### 1. Policy Coverage

In Virginia, "an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts." Seabulk Offshore, Ltd., 377 F.3d at 419 (citing Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 240 Va. 457 (1990)). As with other contracts, when interpreting an insurance policy courts must not strain to find

ambiguities; rather, "the words used are given their ordinary and customary meaning when they are susceptible of such construction." Hill v. State Farm Mutual Auto. Ins., 237 Va. 148, 152 (1989).  A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning.  See Caldwell v. Transp. Ins. Co., 234 Va. 639, 364 (1988).  If the court finds an ambiguity exists, it must be construed against the insurer.  Craig v. Dye, 259 Va. 533 (2000).  Similarly, when it comes to policy exclusions, "where an insured has shown that his loss occurred while an insurance policy was in force, but the insurer relies upon exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case." Bituminous Cas. Corp. v. Sheets, 239 Va. 332 (1990).

In the present case, Admiral Insurance asserts the Employer's Liability exclusion bars coverage for the claims.  Specifically, Plaintiff contends the Underlying Case can only succeed if Plaintiff's injury "arose out of" her employment, a fact that would exclude coverage under the Employer's Liability exclusion.  In contrast, Defendant argues the Employer's Liability exclusion's "arising out of and in the course of employment" language casts the killing of Shanique Harris outside of the exclusion.  Further, Defendant contends the allegations in the Underlying Case, specifically the premises liability claim, is not based upon any employer-employee relationship, and therefore this count clearly falls under the liability policy and dictates that Admiral Insurance owes G4S a duty to defend.  This Court agrees.

The parties spend the bulk of their briefing arguing which interpretation of "arising out of and in the course of employment" the Court should use in determining the meaning of the Employer's Liability exclusion.  As stated above, this policy provision

excludes "bodily injury to an 'employee' of the insured arising out of and in the course of . . . employment by the insured." (Policy Coverage Form ¶ 2(e).)  Plaintiff contends this exclusion requires only that the injury be causally connected, not proximately caused by, the employment relationship. (Pl.'s Mot. for Summ. J. 11.)  In support of this contention, Plaintiff cites numerous cases holding similarly. See, e.g. Forum Insurance Co. v. Allied Security, Inc., 866 F.2d 80 (3d Cir. 1989) (stating that because both employees were at work at the time of the incident, the injury arose out of their employment), Meadowbrook, Inc. v. Tower Ins. Co., 559 N.W. 2d 411, 420 (Minn. 1997) (holding in a sexual harassment in the workplace claim that it is "incongruous to hold that such a claim can arise anywhere but in the course and scope of a plaintiff's employment"), St. Paul Fire & Marine Insurance Company v. Seagate Technology, Inc., 570 N.W.2d 503, 507 (Minn. App. 1997) (stating that an assault by a coworker with whom the victim had a relationship poses the question of "whether her injuries follow as a result of the exposure occasioned by the nature of her employment . . . . It is undisputed that the conditions of her employment provided the time and place for the assault.").  Plaintiff further cites a treatise to identify the purpose of commercial general liability insurance policies, making the argument that this type of insurance is not designed, as Defendant contends, to provide coverage for an employer's liability for injuries to its employees. (Pl.'s Mot. for Summ. J. 9 (citing Thomas F. Segalla, Couch on Insurance, 3rd Edition, § 129:3).)  Defendant counters and states this "but for" interpretation has not been adopted in Virginia, and is further overly broad, making it

contrary to established Virginia law that narrowly construes policy exclusions.[4]  Am. Reliance Ins. Co. v. Mitchell, 238 Va. 543, 547 (1989).

      Defendant further suggests the correct interpretation of this policy language should be found in the workers's compensation statutes, and that the Supreme Court of Virginia only prohibits the use of workers's compensation laws in interpreting insurance policy exclusions when doing so would result in denial of coverage.  Plaintiff, however, disagrees and argues that using workers's compensation law to determine the phrase would be redundant and force the Court to interpret the two exclusions virtually identically, thus nullifying the Employer's Liability exclusion.  While both parties have gone to great lengths to provide varying interpretations of this phrase, the words "arising out of and in the course of employment" are not ambiguous, but rather using the plain meaning of these words, the Court can easily determine the meaning of this exclusion.

      The word "arise" means to originate from a source or come into being.  Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/arise.  Accordingly, the phrase "bodily injury arising out of and in the course of employment" means the injury claimed originated from, or came into being as a result of, the course of Harris's employment; this is not the case.  Rather, it is clear from the facts that the killing of Shanique Harris arose from a personal dispute between Harris and Brown that unfortunately resulted in the death of Harris on her employer's property.  While the

---

[4] Though Defendant correctly states these cases are not binding on the Court, it can also be said the cases are not directly on point, as the parties in the cases were actually engaged in their jobs when the claims arose.  In contrast, Harris was on the premises of her job, but was not acting in any capacity, had not entered the building, nor had she "signed on for the day."

Employer's Liability provision does not exclude coverage, Admiral Insurance's duty to defend only arises if the claims in the Underlying Case are covered by the policy.

### 2. Underlying Case

The parties interpret the Complaint in the underlying case differently. As stated above, Harris makes three claims in the Underlying Case: (1) a negligence claim against G4S for breaching its duty as her "employer . . . and the entity responsible by contract for the security of the premises of the Facility"; (2) a vicarious liability claim against DJJ, an additional insured under the contract, for the actions of the company's agent, G4s; and (3) a premises liability claim against DJJ, for the actions of G4S in breaching its duty of care to employ sufficient security to protect invitees on the facility's premises. Admiral Insurance contends the Complaint does not sufficiently plead a premises liability claim, and further all of the claims are undergirded by the assertion that G4S was on notice of the potential threat Brown could cause solely based on Harris's statements to G4S as her employer. As such, Plaintiff asserts the Underlying Case arises out of the employment relationship and therefore is excluded from coverage under the policy. G4S counters by stating the premises liability claim survived a Motion to Dismiss, and therefore the claim is viable. Additionally, G4S was on notice of Brown's potential threats because an employee of G4S saw Brown with a gun on the evening in question, and other employees were aware, based on their personal relationship with Harris, of Brown's potential danger. Accordingly, G4S contends the claims do not arise out of Harris's employment and Admiral owes G4S a duty to defend. This Court agrees.

In order to have a duty to defend, the claims in the underlying case must be covered under the policy. Fuisz, 61 F.3d at 242. Even if some claims are covered under

the policy and others are not, the duty to defend still attaches. Id. at 245. Here, because at least one claim in the Underlying Case, the premises liability, is based on a duty not arising out of the employment relationship, Admiral Insurance owes G4S a duty to defend the Underlying Case. Further, despite Plaintiff's assertions, the manner in which notice was given is not the deciding factor in determining whether the claim arises out of the employment context; rather, the correct focus is on how the duty was created. In Plaintiff's premises liability claim, the duty is based on G4S's role as "the entity responsible by contract for the security of the premises." (2d Amend. Compl. ¶ 18.) Therefore, regardless of how G4S learned of the potential threat, the Underlying Case is based on G4S's alleged breach of their contractual duty to provide security for the premises, which arises once the company is on notice of a potential threat.

### B. Duty to Indemnify

In addition to the duty to defend, the parties argue whether the issue of indemnity is ripe. Plaintiff contends the Court can decide both the duty to defend and duty to indemnify as the two concepts are intertwined. Specifically, Admiral Insurance states that if this Court finds the company does not owe a duty to defend, it would also follow that they do not have a duty to indemnify. While this statement is true, the reverse is not. A duty to defend is a preliminary issue requiring an insurer to guard against a determination of liability in the underlying case; however, a duty to indemnify is based upon the specific claims alleged and the factual outcome of the Underlying Case, as determined by the trier of fact. Where, as here, the underlying case brings alternative theories and counts, some of which may not trigger policy coverage, the court must abstain on deciding the issue of indemnification until the pending case is resolved.

## III. CONCLUSION

For the reasons stated above, this Court GRANTS Defendant's Cross-Motion for Summary Judgment, and DENIES Plaintiff's Motion for Summary Judgment. Accordingly, this case is DISMISSED.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this  9th   day of June 2009